**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



Russ Kendig
United States Bankruptcy Judge

Dated: 04:02 PM December 22, 2014

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
|  | ) |  |
| ANNIE MARIE PATRICK, | ) | CASE NO. 13-61661 |
|  | ) |  |
| Debtor. | ) | ADV. NO. 13-6103 |
| _____ | ) |  |
|  | ) | JUDGE RUSS KENDIG |
| ANNE MARIE PATRICK, | ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
| v. | ) | **MEMORANDOM OF OPINION (NOT** |
|  | ) | **INTENDED FOR PUBLICATION)** |
| CITIMORTGAGE, INC., | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

On December 14, 2013, Annie Marie Patrick ("Debtor") filed an adversary complaint against CitiMortgage, Inc. ("CitiMortgage") under the Real Estate Settlement Procedures Act ("RESPA") and State of Ohio common law, based on CitiMortgage's actions during a mortgage modification. On July 22, 2014 Debtor filed a motion to compel discovery, which CitiMortgage responded to on August 5, 2014. Both parties have also filed motions for summary judgment: CitiMortgage on August 4, 2014 and Debtor on August 6, 2014. The competing motions for summary judgment, as well as the discovery dispute, are properly before the court.

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

1

## Facts

Debtor initially filed for bankruptcy protection under chapter 7 of the United States Bankruptcy Code ("the Code") on June 27, 2013. Debtor's bankruptcy petition included real property located in Wooster, Ohio (the "Wooster Property") with an estimated value of $46,370.00, secured by a $96,301.95 mortgage. Debtor's efforts in retaining the Wooster Property are the underlying basis of the adversary.

Debtor and her husband purchased the Wooster Property in 1970, and have lived in, and until the last few years, consistently made on time mortgage payments. Unfortunately, due to complications with diabetes, Debtor's husband passed away in August of 2012. Prior to her husband's death, Debtor drove her husband to various medical appointments and provided him with extensive personalized care. Medical expenses combined with the loss of income caused Debtor to fall behind on her mortgage. It was during this period of financial hardship that Debtor contacted CitiMortgage seeking a home mortgage modification under the Home Affordable Modification Program ("HAMP"). HAMP is a government program enacted in the wake of the "Great Recession" of 2008 seeking to stave off mortgage foreclosures by giving banks incentives to reduce a borrower's monthly mortgage payments to a sustainable level. Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 228 (1st Cir. 2013).

After preliminary communications, CitiMortgage determined in September of 2012 that Debtor was eligible for a home mortgage modification under HAMP, and sent Debtor a number of loan modification documents, one of which was a trail period plan ("TPP"). Once a borrower is identified as eligible for a modification, the lender offers the borrower a TPP, which requires the borrower to make a reduced monthly payment for three months. If the debtor makes the three payments, the lender will offer the borrower a permanent loan modification. Debtor encountered numerous difficulties in obtaining her TPP. First, Debtor alleges that CitiMortgage employees were unhelpful during the modification process, often giving conflicting information, and on at least one occasion attempted to convince Debtor to abandon the modification and give up her home. Nevertheless, Debtor returned her TPP paperwork to CitiMortgage on October 2, 2012. Shortly thereafter, CitiMortgage sent Debtor a request for additional information, which Debtor also provided. After further communications, which Debtor describes as stressful and confusing, Debtor finally received a TPP from CitiMortgage. Debtor noticed discrepancies between the information she provided to CitiMortgage and the information in the TPP. For example, the TPP listed Debtor's monthly gross income as $1,657.38, but her actual income was only $1,226.00. Debtor also alleges that insurance payments were improperly added to her monthly mortgage payment. Based on the allegedly faulty information, the TPP required Debtor to make three monthly payments of $520.02. Subject to certain exceptions and rules, HAMP generally caps a borrower's monthly mortgage payments at 31% of monthly gross income. Debtor believes her monthly mortgage payments under the TPP did not comply with the 31% cap. While Debtor was unhappy with the TPP, she nevertheless made these three payments.

After completing the trial period, Debtor was offered and accepted a permanent loan modification ("Modification Agreement"). All parties agree that the Modification Agreement is a valid and properly executed contract. However, similar to the TPP, Debtor is not happy with the

terms of the Modification Agreement and believes her payments are larger than allowed under HAMP. Nevertheless, the Modification Agreement reduced Debtor's monthly mortgage payments from $816.97 to $519.78. Debtor's explanation for signing the Modification Agreement, even with knowledge of the alleged errors, was her belief that she would be able to afford the payments. Debtor also anticipated difficulty in communicating with CitiMortgage, and any delay in receiving a new modification would cause substantial financial hardship.

One of the main disputes in the current case is the extent the Modification Agreement references and incorporates HAMP guidelines. The Modification Agreement is titled "Home Affordable Modification Agreement." The Modification Agreement is a standard form titled "MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT - Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT." The Modification agreement also requires, in a section titled "[Borrower's] Representation and Covenants," that the borrower disclosed all income except for "child support or alimony unless [the borrower chooses] to rely on such income when requesting to qualify for the Home Affordable Modification Program." The same section also requires that "all documents and information [a borrower] has provided to [the lender] in connection with the [modification agreement], including the documents and information regarding [the borrower's] eligibility for [HAMP], are true and correct." The Modification Agreement also references HAMP when requiring a debtor to undergo credit counseling in certain situations. The Modification Agreement "shall supersede any provisions to the contrary in [Debtor's original mortgage]," and modifies Debtor's monthly mortgage payments as follows:

| Years | Monthly Principal and Interest | Estimated Monthly Escrow | Total Monthly Payment |
|-------|-------------------------------|--------------------------|----------------------|
| 1–5 | $ 414.60 | $ 105.18 | $ 519.78 |
| 6 | $ 453.58 | May adjust periodically | May adjust periodically |
| 7–25 | $ 472.92 | May adjust periodically | May adjust periodically |

Debtor also disputes the calculation of her monthly escrow payment. Escrow payments are often made to a mortgage servicer to cover insurance and property taxes. The Modification Agreement notes that escrow payments may change, but Debtor nevertheless argues that CitiMortgage improperly calculated her escrow payments. Debtor received an "Interim Escrow Analysis," indicating an escrow arrearage resulting in a payment increase from $519.78 to $584.57. Debtor, in order to discover the reason for the increase, sent a letter to CitiMortgage, which Debtor describes as a Qualified Written Request ("QWR") under RESPA. Debtor sent the letter to a location in St. Louis, Missouri, which is not CitiMortgage's dedicated facility for answering a QWR. CitiMortgage nevertheless responded to Debtor's inquiry, explaining that the escrow arrearage relates to the payment of duplicative insurance premiums. Debtor argues that CitiMortgage should refund the excess insurance premium, while CitiMortgage believes Debtor is the only party able to seek a refund from the insurance company.

Debtor and CitiMortgage also disagree about the scope of discovery. Debtor sent interrogatories and requests for the production of documents to CitiMortgage on April 9, 2014,

and CitiMortgage responded on May 16, 2014. Debtor believes CitiMortgage has withheld documents under an erroneous claim of privilege without the required background information allowing the court to analyze the claim. According to Debtor, CitiMortgage also failed to respond to certain requests due to a baseless lack of relevance argument. Based on these violations, Debtor moved for discovery sanctions, including a request that certain factual matters be deemed admitted. CitiMortgage disagrees, arguing that it adequately answered Debtor's questions via written responses and the production of approximately five-hundred pages of business records.

## Jurisdiction

Before turning to Debtor and CitiMortgage's arguments, the court must first determine its own jurisdiction. Debtor believes the court has jurisdiction over the current adversary proceeding under 28 U.S.C. § 157(b)(2)(A), (E) and/or (O). CitiMortgage's answer denies that the court has proper jurisdiction, but does not addressed any potential jurisdictional defects in subsequent court filings. Federal courts are courts of limited jurisdiction, and are under a duty to police their own jurisdictional limits. Justice v. Bureau of Worker's Comp. (In re Justice), 224 B.R. 631, 633 (Bankr. S.D. Ohio 1998).

### I.   Subject Matter Jurisdiction

Federal district courts are given subject matter jurisdiction over "all civil proceedings arising under [the Code], or arising in or related to cases under [the Code]." 28 U.S.C. § 1344(b). When determining a bankruptcy court's subject matter jurisdiction, it is not necessary to distinguish between cases arising under, arising in, or related to the Code, as each category "operate[s] conjunctively to define the scope of [bankruptcy] jurisdiction. Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1141 (6th Cir. 1991). Because "related to" jurisdiction is the most expansive, the court has subject matter jurisdiction over any matter related to bankruptcy. Id.

The United States Supreme Court, as well as the Sixth Circuit, have adopted a very broad interpretation of "related to" jurisdiction, known as the Pacor test. Celotex Corp. v. Edwards, 514 U.S. 300, 308 (1995); In re Wolverine Radio, 930 F.2d at 1141. Under the Pacor test, an action is "related to" a bankruptcy case if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984). In other words, an action will be sufficiently related "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." Id.

The current dispute centers upon state common law claims and violations of RESPA. If Debtor is successful the court may award damages, potentially leading to increased creditor distribution. See French v. Johnson Law Grp. (In re Kohlenberg), 2012 WL 3292854, at *3 (N.D. Ohio 2012) (holding that a state law unjust enrichment claim is related to a bankruptcy case because "any recovery would be an asset available for distribution to creditors."). Additionally, any change to Debtor's monthly mortgage payments may result in Debtor maintaining or losing the Wooster Property, either of which may affect the administration of Debtor's bankruptcy case.

4

Therefore, because the adversary case could conceivably have an effect on Debtor's bankruptcy estate, the bankruptcy court has subject matter jurisdiction.[1] In accordance with 28 U.S.C. § 1409, venue in this district and division is proper. However, the court's jurisdictional analysis is not complete, as the classification of a bankruptcy matter as "core" or "noncore" determines the bankruptcy court's ability to enter final judgment.

## II.    Core or Noncore Jurisdiction

Bankruptcy courts have authority to enter final judgments on matters deemed "core" to a bankruptcy case, but may only "submit proposed findings of fact and conclusions of law to the district court" in non-core matters. 28 U.S.C. § 157(b)(1), (c)(1). While what is "core" and "non-core" is not defined by the bankruptcy code, 28 U.S.C. § 157(b)(2) includes a nonexhaustive list of core matters, including the following: "(A) matters concerning the administration of the estate; . . . (K) determinations of the validity, extent, or priority of liens; . . . [or] (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship." 28 U.S.C. § 157(b)(2). Because the list is non-exhaustive, the Sixth Circuit has determined that a matter is core, even if not specifically enumerated, if it "either invokes a substantive right created by federal bankruptcy law or one which could not exist outside of bankruptcy." Waldman v. Stone, 698 F.3d 910, 921–22 (6th Cir. 2012). "In other words, a case is core if it is specifically listed in § 157, 'arises under' the bankruptcy code, or 'arises in' a bankruptcy case," but is "noncore if it is only 'related to' a bankruptcy case." DeGirolamo v. Devonshire Fund, LLC (In re Myers), 2013 WL 6080270, at *6 (Bankr. N.D. Ohio 2013).

Unfortunately, what qualifies as "arising under," "arising in," or "related to" a bankruptcy case is not immediately clear. The "arising under" language "describes those proceedings that involve a cause of action created or determined by a statutory provision of [the Code]." In re Wolverine Radio, 930 F.2d at 1144. For example, a trustee is able to recover certain post-petition transfers based on a grant of authority from § 549, qualifying the action as core under "arising under" jurisdiction. A claim "arises in" a bankruptcy case when a proceeding could only arise within the bankruptcy framework. Id. Examples include "administrative matters, orders to turn over property of the estate and determinations of the validity, extent, or priority of a lien." Stoe v. Flaherty, 436 F.3d 209, 216 (3d Cir. 2006). A cause of action that is not specifically listed in § 157, and also does not either "arise under" or "arise in" the Code, is not a core proceeding. Id.; In re Myers, 2013 WL 6080270, at *6.

In the current case, four main claims are at issue: a state law breach of contract claim, a state law violation of the implied covenant of good faith and fair dealing, a state law conversion claim, and claims for RESPA violations. None of the actions are created by a specific section of the Code, eliminating "arising under" jurisdiction. Additionally, the claims do not "arise in" a bankruptcy case, as each violation often occurs outside bankruptcy. Therefore, for the claims to be core they must fall within one of the specifically enumerated "core" categories. The two most

---

[1] The constitutional framework is as follows: Based on "related to" jurisdiction, the federal district court has subject matter jurisdiction under 28 U.S.C. § 1334. Under the general order of reference dated April 4, 2012, the federal district court transfers the case to the federal bankruptcy court. See Thickstun Bros. Equip. Co. v. Encompass Servs. Corp. (In re Thickstun Bros. Equip. Co.), 344 B.R. 515, 520 (6th Cir. 2006).

relevant sections are §157(b)(2)(A) and (O), which include "matters concerning the administration of the estate" and "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor . . . relationship." While these two broad "catch-all" categories may arguably include Debtor's claims, as explained by two recent United States Supreme Court cases, bankruptcy judges are sometimes prohibited by the Constitution from entering final orders even on matters deemed "core" by § 157. <u>Exec. Benefits Ins. Agency v. Arkison</u>, 134 S.Ct. 2165 (2014); <u>Stern v. Marshall</u>, 131 S.Ct. 2594 (2011).

In <u>Stern</u>, the United States Supreme Court explored the constitutional limits of federal bankruptcy court jurisdiction, focusing on the separation of powers between the legislative and judiciary branches as outlined by the United States Constitution. <u>Stern</u>, 131 S.Ct. 2594. Most federal judges are appointed by the President of the United States under Article III of the United States Constitution, and therefore are guaranteed life tenure and a salary that cannot be decreased. <u>Id.</u> at 2608. These Article III protections are "inseparable element[s] of the constitutional system of checks and balances that both defines the power and protects the independence of the Judicial Branch." <u>Id.</u> "Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial power' on entities outside Article III." <u>Id.</u> at 2609. Therefore, "Congress may not withdraw from [an Article III judge] any matter that was the subject of a suit at common law, or in equity, or admiralty" and have a non-Article III judge enter a final order. <u>Id.</u> Because bankruptcy judges lack Article III protections, they are unable to enter final orders on matters traditionally handled by federal district court judges. <u>Waldman</u>, 698 F.3d at 917.

In the current case, Debtor has asserted a state-law breach of contract claim based on the Modification Agreement's alleged incorporation of HAMP guidelines. Breach of contract claims do not "arise under" or "arise in" the Code, and are traditional common law claims often adjudicated by Article III judges. <u>Cibro Petroleum Prods., Inc. v. City of Albany (In re Winimo Realty Corp.)</u>, 270 B.R. 108, 120 (S.D.N.Y. 2001) ("[I]t is well-settled that [the Constitution] prohibits bankruptcy courts from adjudicating pre-petition contract claims . . . against a nonparty to the bankruptcy."). Similarly, Debtor's state-law claims for violations of the implied covenant of good faith and fair dealing and conversion are common-law claims often decided by Article III judges. <u>Id.</u>; <u>In re Myers</u>, 2013 WL 6080270, at *7. Debtor's claim for a violation of RESPA, which also does not "arise under" or "arise in" a bankruptcy proceeding, is similarly non-core. <u>Sheils v. Wells Fargo Bank, N.A. (In re Fleming)</u>, 495 B.R. 68, 71 (Bankr. M.D. Pa. 2013). Even though Debtor's claims are arguably core under § 157(b)(2)(A) or (O) as "matters concerning the administration of the estate" or "an adjustment of the debtor-creditor . . . relationship," the bankruptcy court lacks constitutional authority to enter a final order. While most bankruptcy courts analyzing HAMP and/or RESPA have not evaluated jurisdiction, courts discussing the matter have generally concluded that the issues are noncore, requiring the bankruptcy court to submit proposed findings of fact and conclusions of law to the district court. <u>See</u> <u>Dang v. Bank of Am.</u>, 2013 WL 1683820, at *7–10 (D. Md. 2013); <u>Inter Nat'l Bank v. Rosales (In re Rosales)</u>, 2012 WL 4343701, at *2–3 (W.D. Tex. 2012); <u>Mitchell v. Wells Fargo Bank, N.A. (In re Mitchell)</u>, 476 B.R. 33, 36 (Bankr. D. Mass. 2012).

A discovery dispute also exists between the parties. The court must determine if it is able to enter an order on discovery matters relating to non-core claims. First, the jurisdictional statute only addresses final orders, stating that for non-core claims "the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and *any final order or judgment* shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo." 28 U.S.C. § 157(c)(1) (emphasis added). "As a general matter, discovery orders are interlocutory and not immediately appealable." In re Gray, 447 B.R. 524, 531 (Bankr. E.D. Mich. 2011); MidFirst Bank v. Johnston, 2014 WL 694943, at *4 (N.D. Ohio 2014). Therefore, while not directly addressed by the jurisdictional statute, "it has been held that a bankruptcy judge may retain jurisdiction over pretrial proceedings and enter interlocutory orders in a [non-core proceeding]." 1 Collier on Bankruptcy, ¶ 3.03[2] (Alan N. Resnick & Henry J. Sommers eds., 16th ed. 2013) (citing Sigma Micro Corp. v. Healthcentral.com (In re Healthcentral.com), 504 F.3d 775, 785–88 (9th Cir. 2007)). The court agrees, as interlocutory order are non-final orders that do not fall within the framework of § 157(c)(1). See Jenkins v. Ward (In re Jenkins), 2013 WL 4805731, at *3 (Bankr. W.D.N.C. 2013); Krohn v. Stipp (In re Plise), 2014 WL 3548383, at *2 (D. Nev. 2014); Trinsum Grp., Inc. v. McTaggart, 467 B.R. 734, 738–39 (Bankr. S.D.N.Y. 2012). Judicial efficiency is also furthered by allowing the bankruptcy court to enter discovery orders, as the bankruptcy judge is likely far more familiar with the bankruptcy case's history than a district court judge. Pension Fin. Servs., Inc. v. O'Connell (In re Arbco Capital Mgmt., LLP), 479 B.R. 254, 267–68 (S.D.N.Y. 2012); Yellow Signs, Inc. v. Freeway Foods, Inc. (In re Freeway Foods of Greensboro, Inc.), 466 B.R. 750, 778 (Bankr. M.D.N.C. 2012). The court will enter an order on the discovery disputes.

## Law & Analysis

Debtor and CitiMortgage have filed competing motions for summary judgment. Both parties also filed memorandum in opposition to the opposing party's motion for summary judgment, as well a reply memorandum in support of their original summary judgment motions. The issues currently before the court are: (1) Does the lack of a private right of action or Debtor's lack of standing under HAMP foreclose Debtor's state law claims; (2) Are HAMP guidelines incorporated into the Modification Agreement; (3) Is summary judgment appropriate for CitiMortgage's alleged breach of the Modification Agreement; (4) Is summary judgment appropriate for CitiMortgage's alleged violation of the implied covenant of good faith and fair dealing; (5) Is summary judgment appropriate for CitiMortgage's alleged conversion; (6) Is summary judgment appropriate for CitiMortgage's alleged RESPA violations; and (7) What discovery sanctions, if any, should be imposed against CitiMortgage? Debtor's complaint initially contained a count for promissory estoppel, but that claim has been abandoned.

### I.      Summary Judgment Standard

A court should grant a party's motion for summary judgment "if the movant shows that there is no genuine dispute to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Bankr. P. 7056(a); Muncie Power Prods., Inc. v. United Techs. Auto., Inc., 328 F.3d 870, 873 (6th Cir. 2003). When making the determination, facts and reasonable inferences should be made in favor of the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 587 (1986). "General averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes." Nw. Mut. Life Ins. Co. v. Rafi, 2010 WL 4181021, at *4 (N.D. Ohio 2010). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, 477 U.S. at 250.

Even though the parties have filed competing summary judgment motions, the standard applied by the court is the same as if only one party had filed for summary judgment. Rafi, 2010 WL 4181021, at *4. The court reviews each summary judgment motion separately and independently determines if either party is entitled to summary judgment. Id.

## II.     Debtor's State-Law Breach of Contract Claim

In order to combat the "Great Recession" of 2008 and help stabilize the real estate market, Congress enacted the Emergency Economic Stabilization Act of 2008 ("EESA"). Young, 717 F.3d at 228. Under authority granted by EESA, the Secretary of the Treasury created a number of programs to identify candidates for mortgage modifications and to encourage lenders to lower a borrower's mortgage payments. Id. The Home Affordable Modification Program ("HAMP"), which is at the center of the current controversy, is one such program. Id. HAMP attempts to entice lenders to offer loan modifications to qualified borrowers, reducing the borrower's mortgage payment to a sustainable level. Id. Once a borrower is identified as modification eligible, the lender offers the borrower a TPP, requiring the borrower to make a reduced monthly mortgage payment for three months. Id. If the payments are made, the lender will offer the borrower a permanent loan modification. Id. As an incentive to engage in loan modifications, the lender receives a $1,000.00 payment from the government for each successful modification. Id. at 229. CitiMortgage entered into a Service Participation Agreement ("SPA") with the United States, implementing HAMP regulations. Allen v. CitiMortgage, Inc., 2011 WL 3425665, at *1 (Bankr. D. Md. 2011).

Debtor argues that HAMP regulations require Debtor's monthly mortgage payment to be calculated in accordance with a HAMP formula, and that CitiMortgage failed to properly apply the formula. CitiMortgage raises three main defenses: (1) HAMP does not include a private right of action; (2) Debtor does not have standing under HAMP; and (3) the parole evidence rule excludes the incorporation of outside evidence into the Modification Agreement, making Debtor bound by the Modification Agreement's plain terms.

### a.     HAMP Does Not Preempt Debtor's Breach of Contract Claim

CitiMortgage's threshold argument is that Debtor's breach of contract claim fails as a matter of law, as the claim is based on a violation of HAMP, which does not include a private cause of action. Additionally, because Debtor is not an intended third party beneficiary of HAMP, Debtor lacks standing to enforce HAMP. Debtor agrees that HAMP does not create a private right of action and that Debtor is not an intended third party beneficiary, but instead insists she is bringing a state-law breach of contract action based on the Modification Agreement's incorporation of HAMP guidelines, which is a separate and distinct cause of action.

8

It is well settled that HAMP does not create a private right of action. <u>Wigod v. Wells Fargo Bank, N.A.</u>, 673 F.3d 547, 555 (7th Cir. 2012); <u>Miller v. Chase Home Fin., LLC</u>, 677 F.3d 1113, 1116 (11th Cir. 2012); <u>Brosius v. Wells Fargo Bank</u>, N.A., 2014 WL 2199627, at *8 (E.D. Mich. 2014) (collecting cases); <u>Starkey v. JP Morgan Chase Bank, N.A.</u>, 2013 WL 6669268, at *4 (S.D. Ohio 2013). Because there is no private right of action, individuals have attempted to enforce HAMP by claiming to be the intended third party beneficiary of the legislation. Ohio applies the "intent to benefit" test, which requires that a contract intend to benefit the third party, and if not, the party is only an "incidental beneficiary" without enforceable contract rights. <u>Huffman v. Bank of Am., N.A.</u>, 2012 WL 5877512, at *2 (S.D. Ohio 2012). While it seems like HAMP, enacted with authority under EESA in response to a nationwide housing crisis, would directly intend to benefit homeowners, HAMP instead explicitly states that it "shall inure to the benefit of and be binding upon the parties to the [SPA]." <u>Id.</u> This language shows a clear intention that HAMP was created only for parties to the SPA (such as CitiMortgage), leaving homeowners incidental beneficiaries. <u>Id.</u> at *3. The "overwhelming majority" of courts agree. <u>Id.</u>

Because HAMP does not contain a private right of action, and homeowners are not intended third-party beneficiaries, some courts have prevented individuals from bringing state law breach of contract claims asserting HAMP violations, stating that such state-law actions are only "HAMP claims in disguise" and are an impermissible "end-run" around HAMP's lack of a private right of action. <u>Wigod</u>, 673 F.3d at 581 (internal quotation marks omitted). However, the issue is not whether federal law creates a private right of action, but whether the lack of a federal remedy forecloses state law remedies. <u>Id.</u>

While CitiMortgage does not couch their argument in preemption language, the idea that HAMP forecloses otherwise available state-law remedies is a preemption issue. <u>Id.</u> at 582; <u>Fletcher v. OneWest Bank, FSB</u>, 798 F.Supp.2d 925, 930–31 (N.D. Ill. 2011). The idea that federal law may preempt state law is rooted in the Supremacy Clause of the United States Constitution. U.S. Const. art. VI, cl. 2 ("[T]he laws of the United States . . . shall be the supreme law of the land."). CitiMortgage does not specifically argue for preemption, but instead states that because Debtor's claims focus on a breach of HAMP guidelines, and not a breach of the Modification Agreement, Debtor's claims should be dismissed. While stated in different language, the court interprets CitiMortgage's argument as advocating for the "end run" theory.

The leading case rejecting the "end-run" theory is the Seventh Circuit's <u>Wigod</u> decision. 673 F.3d 547. In <u>Wigod</u>, the Seventh Circuit was evaluating whether a debtor's compliance with the terms of a TPP entitled him to a permanent mortgage modification. <u>Wigod</u>, 673 F.3d 547. After rejecting normal preemption doctrine, the court turned to the "novel theory that [the debtor's] claims are displaced because they attempt an 'end-run' of the lack of a private action under HAMP itself." <u>Id.</u> at 576. The proponents of the "end-run" theory states their position as follows: "If Congress had intended courts to be adjudicating whether a borrower qualified for a loan modification under . . . HAMP, it would have provided a private right of action—but it chose not to do so." <u>Id.</u>  The Seventh Circuit disagreed, noting that the issue is not whether a federal law provides a remedy, but whether federal law prohibits state law from providing a remedy. <u>Id.</u> The Seventh Circuit cited numerous Supreme Court opinions evaluating federal subject matter jurisdiction, and each decision never suggested that "the absence of a private right

9

of action under a federal statute would prevent state law from providing a cause of action based in whole or in part on violations of federal law." Id. at 581–582 (citing Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 312 (2005); Merrell Dow Pharms., Inc. v. Thompson, 478 U.S. 804, 805–07 (1986)). The Seventh Circuit rejected the "end-run" theory, noting that it "would require adopting the novel presumption that where Congress provides no remedy under federal law, state law may not afford one in its stead." Wigod, at 581.[2]

While evaluating a different statute, the Protecting Tenants at Foreclosure Act of 2009 ("PTFA"), the Sixth Circuit analyzed the same "end-run" theory. Mik v. Fed. Home Loan Mortg. Corp., 743 F.3d 149 (6th Cir. 2014). The Sixth Circuit was evaluating if a plaintiff can use the PTFA to stop a mortgage company from taking certain foreclosure actions. Id. at 166. Similar to HAMP, courts had previously determined that PTFA does not create a private right of action. Id. Therefore, based on the lack of a private right of action, the defendant argued that the PTFA could not be enforced by an individual. The Sixth Circuit rejected the argument, relying on Wigod, which the Sixth Circuit called "analogous." The Sixth Circuit explained that "a violation of federal law can support a state law claim, even when—or, perhaps, *especially* when—there is no private right of action under a federal statute." Id.; Sinclair v. Donovan, 2011 WL 5326093, at *7 n.7 (S.D. Ohio 2011). The court reasoned that "the PTFA would be rendered virtually meaningless if the foreclosure sale purchaser could ignore [the PTFA's] protections with impunity, bypass judicial process and evict tenants without notice or court process." Mik, at 157. Therefore, the Sixth Circuit, in agreeing with the Seventh Circuit, declined to adopt "end-run" preemption, allowing federal laws to be the basis for otherwise valid state law causes of action. Id.; Bosque v. Wells Fargo Bank, N.A, 762 F.Supp.2d 342 (D. Mass. 2011).

CitiMortgage attempts to distinguish Mik from the current controversy based on a number of factors, each of which the court finds unpersuasive. First, and most importantly, the Sixth Circuit called Mik and Wigod "analogous," strongly suggesting that the Sixth Circuit would reject the "end-run" theory in a HAMP case. Mik, at 166. Additionally, the legal reasoning behind the two cases is similar, as both involve federal laws lacking private causes of action. Any attempt to distinguish the cases based on subject matter also fails, as both HAMP and PTFA were adopted to mitigate real estate harms in the wake of the "Great Recession." Even though a borrower may not directly bring a cause of action under HAMP, the lack of a private right of action does not foreclose the availability of an otherwise valid state law cause of action. Holding otherwise would allow a loan modification program designed and modeled around HAMP to not comply with HAMP. See id. at 167.

**b.    Debtor's Breach of Contract Claim Survives Summary Judgment**

Because HAMP may be enforced through a state-law cause of action, the court turns to whether Debtor has alleged a breach of contract claim sufficient to survive summary judgment. First, the court notes the large amounts of litigation pertaining to whether the successful completion of three TPP payments entitles a debtor to a permanent modification. See, e.g., CitiMortgage, Inc. v. Crawford, 934 F.Supp.2d 942, 945–47 (S.D. Ohio 2013); Bosque, 762

---

[2] While the end-run theory has been adopted in some jurisdictions, it appears to be the minority position. See e.g., Montom v. Am.'s Serv. Co., 2012 WL 3596519, at *8–9 (E.D. Va. 2012); Grochowski v. Phoenix Const., 318 F.3d 80, 86 (2d Cir. 2003).

F.Supp.2d at 349–52. However, the court has been unable to locate, and the parties have failed to identify, any cases analyzing if differences between monthly mortgage payments in a validly executed modification agreement and monthly mortgage payments based on HAMP guidelines may form the basis for a state-law breach of contract claim.

An Ohio breach of contract claim contains four elements: "(1) the existence of a binding contract; (2) that the nonbreaching party performed its contractual obligations; (3) the other party failed to fulfill its contractual obligations without legal excuse; and (4) the nonbreaching party suffered damages as a result of the breach." Nachar v. PNC Bank, Nat'l Ass'n, 901 F.Supp.2d 1012, 1018 (N.D. Ohio 2012). Both parties agree that the Modification Agreement is a valid and binding contract, satisfying the first element. CitiMortgage does not argue that Debtor failed to fulfiller her contractual obligations, satisfying the second element. Debtor has satisfied the fourth element by sufficiently pleading damages due to mortgage payments being greater than those otherwise required under HAMP. Therefore, the breach of contract claim turns on the third element: If the Modification Agreement incorporates HAMP guidelines and if CitiMortgage improperly applied HAMP to Debtor's modification.

### 1.      The Court May Evaluate Extrinsic Evidence

Under Ohio law, "the interpretation of a written instrument is, in the first instance, a matter of law for the court." Blair v. McDonagh, 894 N.E.2d 377, 388 (Ohio Ct. App. 1st 2008). When interpreting a contract, "the role of the court is to give effect to the intent of the parties to that agreement." Martin Marietta Magnesia Specialties, LLC. v. Pub. Util. Comm., 954 N.E.2d 104, 109–10 (Ohio 2011); State ex rel. Petro v. R.J. Reynolds Tobacco Co., 820 N.E.2d 910, 915 (Ohio 2004). Towards this end, the court starts with the "four corners" of the contract, and "presumes that the intent of the parties is reflected in the language used in the agreement." Id. at 110. Only if "the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning, will extrinsic evidence be considered in an effort to give effect to the parties' intentions." Huff v. FirstEnergy Corp., 957 N.E.2d 3, 7 (Ohio 2011). Whether a contract is ambiguous is a matter of law initially determined by the court, but if a contract is found to be ambiguous, the contract's interpretation becomes an issue of fact. Potti v. Duramed Pharms., Inc., 938 F.2d 641, 647 (6th Cir. 1991). "[W]here the written contract is standardized and between parties of unequal bargaining power, any ambiguity in the writing will be interpreted strictly against the drafter." Westfield Ins. Co. v. Galatis, 797 N.E.2d 1256, 1262 (Ohio 2003).

"The parol-evidence rule is a principle of common law providing that a writing intended by the parties to be a final embodiment of their agreement cannot be modified by evidence of earlier or contemporaneous agreements that might add to, vary, or contradict the writing." Bellman v. Am. Int'l Grp., 865 N.E.2d 853, 856–57 (Ohio 2007) (internal quotation marks omitted). Courts apply the parol evidence rule to protect the integrity of the written contract, creating "a presumption that a subsequent written contract is of a higher nature than earlier statements, negotiations, or oral agreements by deeming those earlier expressions to be merged into or superseded by the written document." Charity v. GMAC Mortg. Inv., 2010 WL 3648949, at *8 (N.D. Ohio 2010). The parol evidence rule only prohibits evidence of agreements made before the contract, not contracts or oral agreements entered into after contract formation.

11

Williams v. Spitzer Autoworld Canton, LLC, 913 N.E.2d 410, 416 (Ohio 2009). While the parole evidence rule normally prohibits the inclusion of prior information, if a contract is ambiguous, prior communications and agreements may be admitted to clear up the ambiguity. Ill. Controls, Inc. v. Langham, 639 N.E.2d 771, 779 (Ohio 1994); Huff, 957 N.E.2d at 7. However, "parol evidence cannot be admitted if its effect will be to vary or contradict any matter that is specifically covered by the written terms of the contract." Astor v. Int'l Bus. Mach. Corp., 7 F.3d 533, 539 (6th Cir. 1993) (internal quotation marks omitted).

First, the Modification Agreement is titled "Home Affordable Modification Agreement," which the courts views as a clear reference to HAMP. See Wigod, 673 F.3d at 565 (holding that a contract titled a Home Affordable Modification Program Loan Trial Period "unquestionably informed the reasonable expectations of the parties" that any associated permanent modification would comply with HAMP). Similarly, the bottom of each page of the Modification Agreement lists the form contract used as the "MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT." The Modification Agreement also requires Debtor to disclose all sources of income, except for alimony and child support if those sources were not included when determining HAMP eligibility. If the lender requires Debtor to do so, the Modification Agreement also requires Debtor to receive HAMP approved credit counseling. The Modification Agreement contains a provision requiring Debtor, under penalty of perjury, to affirm that all the documents provided relating to HAMP eligibility are accurate. Post Modification Agreement communications between CitiMortgage and Debtor, which are not excluded by the parol evidence rule, include the phrase "[i]n accordance with the Homeowners Affordable Modification program guidelines," again suggesting that the parties intended HAMP to govern the Modification Agreement. Based on the above information, the court believes the Modification Agreement's incorporation of HAMP is ambiguous, allowing the admittance of extrinsic evidence.

Extrinsic evidence only strengthens the position that Debtor and CitiMortgage intended the Modification Agreement to incorporate HAMP regulations. Before entering into the Modification Agreement, communications often contained the CitiMortgage logo in the top left corner and the Making Home Affordable logo in the top right corner. Debtor also received a CitiMortgage form explaining that Debtor was being evaluated for a HAMP modification. In other communications, CitiMortgage requested documentation from Debtor before "Lower[ing] your mortgage payments through this program," when "program" is a reference to HAMP. The TPP also contained the CitiMortgage Logo, the Making Home Affordable logo, and reads: "Congratulations! You are approved to enter into a trial period plan under the Home Affordable Modification Program." Additionally, included within the Modification Agreement is another document explaining the modification process, which reads as follows: "Congratulations! You are eligible for a Home Affordable Modification" and describes HAMP as a program "created to help millions of homeowners refinance or modify their mortgages. As part of this program, we— your mortgage servicer—and the Federal Government are working to offer you options to stay in your home." After CitiMortgage received Debtor's Modification Agreement, they sent a confirmation letter to Debtor stating "[i]n accordance with the Homeowners Affordable Modification program guidelines, we have enclosed a copy of the complete modification agreement signed by CitiMortgage." The combination of the language in the Modification

12

Agreement and extrinsic evidence provide a large amount of support for Debtor's position that the Modification Agreement incorporates HAMP.

### 2. The Incorporation of HAMP Guidelines Survives Summary Judgment

The incorporation of federal guidelines into a contract can be sufficient grounds for a breach of contract claim. Ranson v. Bank of Am., N.A., 2013 WL 1077093 (S.D. W.Va. 2013); Sinclair, 2011 WL 5326093, at *7; Baker v. Countrywide Home Loans, Inc., 2009 WL 1810336, at *5 (N.D. Tex. 2009); HSBC Bank USA, Nat'l Trust Co. v. Teagarden, 6 N.E.3d 678, 685–86 (Ohio Ct. App. 11th 2013). Generally, governmental regulations without a private right of action are only incorporated into a contract when "clearly referenced." Bates v. JPMorgan Chase Bank, NA, 2014 WL 4815564, at *4 (11th Cir. 2014); Baker, 2009 WL 1810336, at *5. For example, in In re Shelton, a bankruptcy court was evaluating whether the following language in the debtor's mortgage required the lender to abide by HUD regulations:

> Regulations of the HUD Secretary: In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. The Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.

Shelton v. Wells Fargo Bank (In re Shelton), 481 B.R. 22, 25 (W.D. Mo. 2012). The court found that the above language created issues pertaining to the contract's incorporation of federal guidelines sufficient to survive summary judgment. Id. at 30; see also Mathews v. PHH Mortg. Corp., 724 S.E.2d 196, 200 (Va. 2012). Similarly, in Mullins v. GMAC Mortgage, the court decided that a deed of trust stating that it "does not authorize acceleration of foreclosure if not permitted by regulations of the [HUD] Secretary" sufficiently incorporated HUD regulations to survive a 12(b)(6) motion. 2011 WL 1298777, at *2 (S.D. W.Va. 2011). While under slightly different circumstances, the Seventh Circuit in Wigod determined that references to HAMP within a TPP requires the associated modification agreement to comply with HAMP. Wigod, 673 F.3d at 565. The Seventh Circuit focused on the TPP's title, which was the "Home Affordable Modification Program Loan Trial Period," leading the court to conclude that the "HAMP guidelines unquestionably informed the reasonable expectations of the parties" that any modification agreement offered after completion of the trial period would comply with HAMP. Id. However, not all references are sufficient to incorporate a statute or regulation. For example, a contract stating it "shall not limit the applicability of federal law" is insufficient, as the incorporation language is too vague and does not include a direct reference to the regulation to be incorporated. Law v. Ocwen Loan Servicing, LLC, 2014 WL 5285947, at *3 (5th Cir. 2014); Condel v. Bank of Am., N.A., 2012 WL 2673167, at *8 (E.D. Va. 2012).

The court believes an issue of fact exists pertaining to the Modification Agreement's incorporation of HAMP. When interpreting a contract, the court strives to give effect to the parties' intention as outlined within the contractual language, and as the above discussion makes clear, that intention is ambiguous. Extrinsic evidence only adds to the confusion. An issue of fact

13

remains that is inappropriate for summary judgment. See Cave v. Saxon Mortg. Services, Inc., 2012 WL 1957588, at *4 n.5 (E.D. Pa. 2012).

### 3. An Issue of Fact Remains Relating to Debtor's HAMP Waiver

CitiMortgage makes one final argument pertaining to the incorporation of HAMP guidelines: the Modification Agreement explicitly states Debtor's monthly mortgage payments and therefore extrinsic evidence cannot be admitted to contradict the contract's the plain terms. CitiMortgage is correct, as Ohio prohibits evidence "introduced to show an agreement between the parties that is materially different from that expressed by the clear and unambiguous language of the instrument." Cave, 2012 WL 1957588, at *4 n.5. For example, an oral agreement increasing a party's maximum contractual liability cannot be introduced to contradict a valid written contract with a liability cap. Expeditors Intern. of Wash., Inc., v. Crowley Am. Transp., Inc., 117 F.Supp.2d 663, 670 (S.D. Ohio 2000). However, extrinsic evidence is not being introduced to directly contradict the Modification Agreement's monthly mortgage payments, but instead to help determine if the Modification Agreement incorporates HAMP.

Taking all reasonable facts in Debtor's favor, HAMP may have been incorporated into the Modification Agreement. If so, Debtor's monthly payments may violate HAMP. Simply because the monthly payments in the Modification Agreement are unambiguous does not eliminate potential HAMP violations. However, in many situations a contract may legally alter certain laws and regulations. As long as the contract does not "nullify the purposes of the statute [or regulation] and thwart the legislative policies it was designed to effectuate," the contract term is likely valid. Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 740 (1996); Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 23 (1991); Madry v. Gibraltor Nat'l Corp., 2011 WL 1565807, at *2 (E.D Mich. 2011). Assuming that the Modification Agreement may override HAMP, any waiver is only applicable if "voluntary, knowing, and intelligently made." D.H. Overmyer Co. v. Frick Co., 405 U.S. 174, 185 (1972).

Issues of fact remain regarding Debtor's HAMP waiver. While contractual terms may sometimes alter statutes and regulations, it is currently inappropriate to decide if Debtor's acceptance of the Modification Agreement represents a "voluntary, knowing, and intelligently made" waiver. Similarly, issues of fact remain regarding whether Debtor's HAMP waiver, if any, is counter to the statute's policy and purpose. See id. at 740. Debtor's state-law breach of contract claim survives summary judgment.

### III. CitiMortgage is Entitled to Summary Judgment on Debtor's Breach of Contract Claim for Duplicative Insurance Payments

Debtor argues that CitiMortgage has breached the Modification Agreement or the underlying mortgage by failing to properly make, apply, or reimburse Debtor for duplicative insurance payments made out of Debtor's escrow account. Specifically, Debtor believes CitiMortgage made insurance payments to Allied Insurance ("Allied") and Ohio Mutual Insurance Group ("Ohio Mutual") to cover the homeowner's insurance on the Wooster Property for the same time period. Debtor does not site any contractual provision CitiMortgage breached. In response, CitiMortgage notes that Debtor's mortgage requires CitiMortgage to make payments

14

from the escrow account sufficient to cover taxes and insurance, but allows Debtor to choose the insurance coverage and carrier. Section 2605(g) of RESPA also requires the mortgage servicer to pay insurance premiums as they become due out of the escrow account. CitiMortgage also believes Debtor is the only party able to seek the return of the duplicative payments.

Debtor's briefs have done little to rebut CitiMortgage's arguments. Debtor's complaint, in full, states the claim as follows: "[CitiMortgage's] improper diversion of Plaintiff's payments into duplicative insurance coverage and refusing to correct the error constitutes a breach of the loan agreement in which the parties agreed that [CitiMortgage] properly apply [Debtor's] payments to designated purposes." Debtor's motion for summary judgment does not address the claim. While Debtor did address the claim in her response to CitiMortgage's motion for summary judgment, she only makes unclear references to CitiMortgage's violation of the duty of good faith or breach of contract. Debtor again cites no contractual provisions CitiMortgage may have violated. "The court does not have the duty to search the record for evidence favoring either party and generally should consider only the evidence submitted by the parties or brought to the court's attention." In re McIntire, 2008 WL 1771861, at *2 (Bankr. E.D. Tenn. 2008); see also Neely v. Good Samaritan Hosp., 494 F.Supp.2d 837, 840–41 (S.D. Ohio 2007).

Turning to the current dispute, the two home insurance policies at issue are with Allied and Ohio Mutual. Allied, Debtor's first insurance carrier, sent CitiMortgage an insurance invoice covering the Wooster Property dated July 2, 2012 and requiring payment by no later than August 16, 2012. Debtor's new insurance carrier, Ohio Mutual, sent a similar invoice to CitiMortgage dated August 16, 2012 and requiring payment by no later than September 6, 2012. Based on these dates, the payment to Allied was due the same day the Ohio Mutual invoice was generated. As CitiMortgage is obligated by the mortgage and RESPA to pay Debtor's insurance premiums as they become due, sending the payment to Allied is not a contractual violation. Relating to the refund of the duplicative payment, the insurance contract between Allied and Debtor states that "[Debtor] may cancel this policy at any time by returning it to [Allied] or by letting [Allied] know in writing of the date the cancellation is to take effect." The same contract also notes that "the premium for the period from the date of cancellation to the expiration will be refunded pro rata." Debtor's insurance contract with Allied requires Debtor to seek a refund if a policy is cancelled, not CitiMortgage. CitiMortgage is entitled to summary judgment on Debtor's breach of contract claim for escrow violations.

## IV.    CitiMortgage is Entitled to Summary Judgment on Debtor's Claim for a Breach of the Implied Covenant of Good Faith and Fair Dealing

Within Ohio, "[p]arties to a contract are bound toward one another by standards of good faith and fair dealing," which requires honesty and reasonableness when enforcing a contract. Pappas v. Ippolito, 895 N.E.2d 610, 642 (Ohio Ct. App. 8th 2008); Littlejohn v. Parrish, 839 N.E.2d 49, 54 (Ohio Ct. App. 1st 2005). "Good faith is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." Florence Urgent Care v. Healthspan, Inc., 445 F.Supp.2d 871, 879 (S.D. Ohio 2006) (internal quotation marks omitted). The implied covenant of good faith cannot be used to add terms to a contract or alter the terms already contained within a contract. Metro Comm'c'n Comp. v. Ameritech Mobile

15

Commc'n, Inc., 984 F.2d 739, 743 (6th Cir. 1993); Littlejohn, 839 N.E.2d at 49; Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp., 441 F.Supp.2d 695, 712 (M.D. Pa. 2006). Because the implied covenant of good faith and fair dealing is a rule of statutory construction, and not an independent cause of action, an action for breach of contract must exist before a claim for a violation of the duty of good faith and fair dealing. Wendy's Intern. Inc. v. Saverin, 377 F. App'x. 471, 476–77 (6th Cir. 2009); Nachar, 901 F.Supp.2d at 1019; Lakota Local Sch. Dist. Bd. of Edn. v. Brickner, 671 N.E.2d 578 (6th Dist.1996). In the current case, both parties agree that the Modification Agreement is a valid contract, and, as explained above, Debtor's breach of contract action survives summary judgment.

The case of Scotts v. Farnam Co. helps to illustrate the difficulty in succeeding on a claim for a violation of the implied covenant of good faith and fair dealing. The Scotts Co. v. Farnam Cos., 659 F.Supp.2d 913 (S.D. Ohio 2009). In Scotts, the Scotts Company entered into an agreement to sell a portion of their company to the Farnam Company, with a significant portion of the sale price based on performance benchmarks. 659 F.Supp.2d at 926–28. The Scotts Company argued that Farnam sold excess inventory similar to many of the Scotts Company's products in the months leading up to the sale, causing the Scotts Company to miss certain benchmarks, resulting in a substantially lower sale price. Id. However, because the parties were aware of the benchmarks at the time of contract formation and could have bargained for different benchmarks or restricted Farnam Company sales, the court was unwilling to read a sales prohibition into the contract. Id. Similarly, in Wendy's International, the court was evaluating a claim for a violation of the implied covenant of good faith and fair dealing in a dispute between a franchisor and franchisee. 337 F. App'x. at 473. The franchise agreement provided that Wendy's International could terminate the plaintiff's contract for the operation of a Wendy's restaurant if the franchise went into receivership. Id. at 476. The plaintiff argued that Wendy's violated the implied covenant of good faith and fair dealing by taking actions to expedite the receivership process. Id. However, because the implied covenant only applies to "acts or omissions that could not have been contemplated at the time of drafting [of the contract]," and as the contract specifically dealt with receiverships, Wendy's actions were foreseeable at contract formation, causing the plaintiff's claim to fail. Id. at 477–78.

In the current case, Debtor argues that CitiMortgage's failure to comply with HAMP guidelines when calculating her monthly mortgage payments, as well as CitiMortgage's failure to adequately respond to a QWR,[3] evidences a violation of the implied covenant of good faith and fair dealing. In response, CitiMortgage argues that because there was no breach of the Modification Agreement, any claim for a breach of the implied duty of good faith and fair dealing must fail. CitiMortgage also notes that the Modification Agreement explicitly outlines Debtor's monthly mortgage payments and that the implied covenant of good faith and fair dealing cannot be used to create or alter explicit contract terms.

CitiMortgage has the better argument. While the court's earlier analysis determined that Debtor's state-law breach of contract claim survives summary judgment, that potential breach does not automatically cause a violation of the implied covenant of good faith and fair dealing. The Sixth Circuit has determined that the implied covenant only applies when parties take an

---

[3] The court's analysis of Debtor's claim for a failure to respond to a QWR, as well as analysis of other potential RESPA violations, can be found in Part VI–VII.

action that could not have been contemplated at contract formation. The Modification Agreement specifically deals with Debtor's monthly mortgage payments, making the amount of those payments clearly within the contemplation of the parties at contract formation. Additionally, as will be evaluated in more detail below, Debtor's RESPA claims fail as a matter of law, eliminating the required underlying contractual breach. CitiMortgage is entitled to summary judgment.

### V.   CitiMortgage is Entitled to Summary Judgment on Debtor's Conversion Claim

In the current case, Debtor states that she made payments into an escrow account maintained by CitiMortgage and used for the payment of her insurance premiums and property taxes. While CitiMortgage was making insurance payments out of the escrow account on one insurance policy, Debtor obtained new insurance. CitiMortgage then paid Debtor's new insurance out of the same escrow account, resulting in duplicative coverage. The portion of Debtor's brief asking for summary judgment on the conversion claim is short, only listing the elements of the claim and then stating that "[CitiMortgage's] improper payment from [Debtor's] escrow fund of payment for duplicative insurance coverage and refusal to credit [Debtor] for this error establishes its liability for conversion." In response, CitiMortgage argues that conversion is generally unavailable for money and that it was Debtor's responsibility to cancel the duplicative insurance and seek a refund from the insurance carrier.

Conversion is the "wrongful exercise of dominion over property in exclusion of the right of the owner, or withholding it from his possession under a claim inconsistent with his rights." Findlay v. Hotels.Com, L.P., 441 F.Supp.2d 855, 864–65 (N.D. Ohio 2006). The elements of conversion under Ohio law are: "1) plaintiff's ownership or right to possession of the property at the time of the conversion; 2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and 3) damages." Id. A conversion claim is available, as in the current case, where one party initially gives permission to another to hold assets, but the party seeking turnover must first demand return of the assets and be denied. Wuliger v. Cannella Response Television, Inc., 865 F.Supp.2d 836, 843 (N.D. Ohio 2011); Hotels.Com, 441 F.Supp.2d at 865.

When dealing with money, unless a party is seeking the return of specific and identifiable dollars, conversion is unavailable. Dana Ltd. v. Aon Consulting, Inc., 984 F.Supp.2d 755, 768–69 (N.D. Ohio 2013). "[T]he general rule in Ohio [is] that money is intangible property that cannot be subject to conversion." Gascho v. Global Fitness Holdings, LLC, 863 F.Supp.2d 677, 700 (S.D. Ohio 2012). A claim for monetary conversion will only succeed "if the funds are specifically identified, are held in trust, or are withheld by a person owing a fiduciary duty to the plaintiff." Ortega v. Wells Fargo Bank, N.A., 2012 WL 275055, at *12 (N.D. Ohio 2012). In other words, absent a fiduciary or trust relationship, "conversion of money occurs only when the money is specifically earmarked, or capable of identification such as money in a bag, coins or notes that have been entrusted to the defendant's care, or funds that have otherwise been sequestered." Dana Ltd., 984 F.Supp.2d at 768–69 (internal quotations marks omitted). For example, in Ortega, the plaintiff applied for a mortgage modification, but the bank mishandled her application and assessed inappropriate fees and misapplied mortgage payments. 2012 WL 275055, at *1–3. The court dismissed the plaintiff's conversion claim anyway, reasoning that

17

because the plaintiff's payments to the mortgage servicer were comprised of fungible assets, and the debtor-creditor relationship did not create a fiduciary or trust relationship, the plaintiff's conversion claim fails as a matter of law. Id. Similarly, in Dana, Dana Limited ("Dana"), a company with a defined benefit pension, brought a conversion claim against Aon Consulting ("Aon"), the company Dana hired to run its pension plan, for making payments totaling $1.9 million to ineligible beneficiaries. 984 F.Supp.2d at 759–60. Dana's conversion claim asks for $1.9 million in damages, but does not suggest Dana is entitled to "recover the exact monies paid to each ineligible beneficiary," failing the monetary conversion specificity element.[4] Id. at 769.

Similar to Ortega and Dana, Debtor's conversion claim fails. Debtor and CitiMortgage have a debtor–creditor relationship, and a fiduciary or trust relationship is not alleged. Therefore, unless the conversion claim seeks to recover identical funds, the claim fails as a matter of law. Ortega, 2012 WL 275055, at *12. Debtor's payments into the escrow account were not only paid to Allied, but also to Ohio Mutual and the State of Ohio. Payments continuously flowed into and out of the escrow account for various purposes, making the monies fungible and not specifically identifiable. Debtor also has not requested the return of same monies paid into the escrow account, but instead only the sum of money used for duplicative insurance. Dana Ltd., 984 F.Supp.2d at 768–69.

Additionally, an Ohio conversion claim requires that the defendant commit "a wrongful act or disposition of plaintiff's property rights." Hotels.Com, 441 F.Supp.2d at 864–65. As previously noted, § 2605(g) of RESPA and Debtor's mortgage both require CitiMortgage to make property insurance payments out of Debtor's escrow account as the payments become due. Allied, Debtor's initial insurance carrier, sent CitiMortgage an invoice requiring payment by August 16, 2012, and Ohio Mutual, Debtor's new insurance carrier, did not generate and send their invoice until the same day. CitiMortgage's actions in paying Allied were not a wrongful act. Debtor also states that CitiMortgage should have returned the duplicative payment, but Debtor's insurance contract with Allied only allows the borrower to cancel the insurance policy and seek a refund, making no reference to an escrow administrator obtaining a refund. Debtor has failed to allege that CitiMortgage committed a "wrongful act or disposition of plaintiff's property rights," which is necessary under the second element of an Ohio conversion claim. CitiMortgage is entitled to Summary Judgment.

## VI.    CitiMortgage is Entitled to Summary Judgment on Debtor's RESPA Claims

The Real Estate Settlement Procedures Act ("RESPA") is a consumer protection statute passed to reform the mortgage settlement process. Augenstein v. Coldwell Banker Real Estate LLC, 2011 WL 3837096, at *3 (S.D. Ohio 2011). "Congress's intent was to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." Marais v. Chase Home Fin., LLC, 2014 WL 2515474, at *5 (S.D. Ohio 2014). Debtor brings claims under § 2605(e), which seeks to provide a debtor with timely information after making a

---

[4] While a defendant is unable to bring a conversion claim in many financial situations, actions for breach of contract or assumpsit may still exist. NPF IV, 922 F.Supp at 82.

18

formal information request to a mortgage servicer, and § 2605(k)(1)(C), which prohibits a mortgage servicer from failing to timely respond or correct payment allocations errors.

### a. CitiMortgage is Entitled to Summary Judgment on Debtor's § 2605(e) Claim

The first RESPA provision at issue requires a mortgage servicer to respond to a qualified written request ("QWR") received from a mortgagee within a statutorily specified timeframe. 12 U.S.C. § 2605(e).  A QWR is any:

> written correspondence . . . that: (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e). If the above requirements are met, the mortgage servicer must "provide a written response acknowledging receipt of the correspondence within 5 days" and respond within thirty days noting that one of the following three actions has occurred: (1) appropriate corrections were made to the borrower's account; (2) after an investigation, explain why the mortgage servicer believes no error has occurred and provide contact information; or (3) after an investigation, explain why the mortgage servicer does not have the information required to make a determination and provide contact information. 12 U.S.C. § 2605(e)(1)–(2).

The Department of Housing and Urban Development ("HUD") issued additional guidance relating to § 2605(e) in 24 C.F.R. § 3500.21(e). The regulation recites, essentially verbatim, the definition of a QWR from 12 U.S.C. § 2605(e), but also states that a mortgage servicer "may establish a *separate and exclusive* office and address for the receipt and handling of qualified written requests." 24 C.F.R. § 3500.21(e)(1) (emphasis added). Courts are split on whether the language adds the additional substantive requirement that a written request be sent to a designated location before qualifying as a QWR.

While the Sixth Circuit has not addressed the regulation, a number of other courts have. The vast majority have decided that if a mortgage servicer has established a separate and exclusive location for dealing with written borrower information requests, any request must be sent to that address to qualify as a QWR. See, e.g., Berneike v. CitiMortgage, Inc., 708 F.3d 1141, 1148–49 (10th Cir. 2013); Moody v. CitiMortgage, Inc., 2014 WL 3501051, at *4 (W.D. Mich. 2014) (collecting cases). However, a small number of cases have decided otherwise, holding that the regulation allows a mortgage service to set up an address for receipt of QWRs, but does not require a borrower to use that address. Benner v. Bank of Am., 917 F. Supp.2d 338 (E.D. Pa. 2013).

The United States Supreme Court has previously addressed the relative legal authority of regulations as compared to statutes. First, the court asks if Congressional intent is clear based on the statutory language. Regions Hosp. v. Shalala, 522 U.S. 448, 457 (1998). If the statute is clear,

19

that ends the analysis, and any regulation in conflict with the statute is invalid. Id. However, "if the statute is silent or ambiguous with respect to the issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. A regulation is a permissible construction if it "fills a gap or defines a term in a reasonable way in light of the Legislature's design," even if the solution is not what the court would have determined if given a clean regulatory slate. Id. As long as the regulation is not "arbitrary, capricious, or manifestly contrary to the statute," the regulation will stand. Chevron, USA, Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984).

The court's analysis begins with the statutory language. The specifically enumerated statutory requirements for a correspondence to qualify as a QWR are: "1) be written; (2) not be included with a payment; (3) include the name and account number of the borrower, or a way to enable the servicer to identify the account; and (4) include a statement of the reasons the borrower believes the account to be in error, or include sufficient detail to enable the servicer to determine what information is being sought." 12 U.S.C. § 2605(e)(1)(A)–(B); Moody, 2014 WL 3501051, at *3. The statute also requires that a mortgage servicer "receive" the correspondence, but does not define "receive" or make any reference to a "separate and exclusive" QWR location. 12 U.S.C. § 2605(e)(1)(A); Berneike, 708 F.3d at 1148. Therefore, RESPA is silent regarding a mortgage servicer's ability to create an exclusive QWR location, and legislative history provides no insight. Berneike, 708 F.3d at 1148. Because the statutory language is unclear, the court must determine if the regulation permissibly fills a gap in the statute, or defines an undefined term in a manner consistent with the statute's overarching purpose. See Shalala, 522 U.S. at 457.

Congress empowered HUD to "proscribe such rules and regulations, to make such interpretations . . . as may be necessary to achieve the purposes of this chapter." 12 U.S.C. § 2617; Berneike, 708 F.3d at 1148. The court finds that a regulation allowing a mortgage servicer to "establish a separate and exclusive office and address for the receipt and handling of qualified written requests" is a valid exercise of the regulatory authority. First, 12 U.S.C. § 2605(e) does not define receipt, and requiring a QWR to be sent to a specific location fills a statutory gap. One of the main purposes of RESPA is to give borrowers "greater and more timely information" relating to mortgage costs and expenses, and allowing a mortgage servicer to designate a specific location in no way undermines this goal, and arguably furthers it. Berneike, 708 F.3d at 1149 (citing Watt v. GMAC Mortg. Corp., 457 F.3d 781, 783 (8th Cir. 2006)). The regulation is not "arbitrary, capricious, or manifestly contrary to the statue," and the court gives the regulation controlling weight. Berneike, 708 F.3d at 1149.

CitiMortgage notes that it sufficiently informed Debtor of the "separate and exclusive" QWR mailing address. In Debtor's monthly mortgage statement, a section titled "Customer Service" contains the following language:

> PURSUANT TO § 6 OF RESPA, A "QUALIFIED WRITTEN
> REQUEST" REGARDING THE SERVICING OF YOUR LOAN
> MUST BE SENT TO THIS ADDRESS: CITIMORTGAGE, INC.
> ATTN: CUSTOMER RESEARCH TEAM, PO BOX 10002,
> HAGERSTOWN, MD 21749-0002. A "qualified written request"
> is a written correspondence, other than notice on a payment

20

> coupon or statement, which includes your name, account number
> and the reasons for the request.

Both parties agree that Debtor's written correspondence was sent to an address in Missouri.

Based on the evidence provided, the court finds that CitiMortgage established a "separate and exclusive" location where any QWR must be sent. Because Debtor's letter did not comply with the location requirement, it is "nothing more than general correspondence between a borrower and a servicer." Moody, 2014 WL 3501051, at *5; Steele v. Green Tree Servicing, LLC, 2010 WL 3565415, at *3 (N.D. Tex. 2010). The court understands that Debtor's communications with CitiMortgage may have been frustrating, but Debtor's correspondence does not meet the requirements necessary to qualify as a QWR.

### b. CitiMortgage is Entitled to Summary Judgment on Debtor's § 2605(k) Claim

Debtor also argues that CitiMortgage violated Section 2605(k)(1)(C) of RESPA, which states that: "A servicer of a federally-related mortgage shall not . . . fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties." Debtor states that CitiMortgage's failure to refund payments out of her escrow account for duplicative insurance violates § 2605(k), while CitiMortgage argues that the statute was not in effect until January 10, 2014, after any alleged violations occurred.

In 2010, as part of a response to the "Great Recession," Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), which, along with a large number of other provisions, amended portions of RESPA and added sections (k)–(m) to 12 U.S.C. § 2605. Schneider v. Bank of Am., N.A., 2013 WL 1281902, at *11 (E.D. Cal. 2013). As part of Dodd-Frank, HUD transferred certain consumer protection regulations to the newly created Bureau of Consumer Financial Protection ("Bureau"). Berneike, 708 F.3d at 1145 n.3. Regarding the applicability of the Dodd-Frank changes, the statute states that they "shall take effect on the date on which the final regulations implementing such section, or provision, take effect" or, if no regulations have been issued, "on the date that is 18 months after the designated transfer date." Id. Dodd-Frank lists the transfer date as July 21, 2011, making January 21, 2013 the effective date if no regulation is implemented. Id. However, on January 17, 2013, four days before the effective date, the Bureau issued a final rule implementing the Dodd-Frank amendments with a new effective date of January 10, 2014. Id. While the date from the regulation is more than eighteen months after the original designated transfer date, the regulation was put in place before the January 21, 2013 deadline. Therefore, the Dodd-Frank changes became effective on January 10, 2014. The vast majority of courts agree. See, e.g., Houston v. U.S. Bank Home Mortg. Wis. Servicing, 505 F. App'x 543, 547 (6th Cir. 2012); Cezair v. JPMorgan Chase Bank, N.A., 2014 WL 4295048, at *8 n.10 (D. Md. 2014); Steele v. Quantum Servicing Corp., 2013 WL 3196544, at *6 (N.D. Tex. 2013).

Debtor filed for bankruptcy on June 27, 2013, and filed the current adversary case on December 15, 2013. Debtor's complaint lists communications throughout 2013 that may give

rise to liability under § 2605(k). As these actions occurred during 2013, and § 2605(k) did not become effective until 2014, CitiMortgage is entitled to summary judgment.

## VII.    Discovery Disputes

As noted above, Debtor's breach of contract claim survives summary judgment. For that reason, the court will turn to the parties' discovery dispute. As part of the discovery process, Debtor sent CitiMortgage a set of twenty interrogatories and eleven requests for the production of documents. Debtor believes important information pertaining to the calculation of Debtor's monthly mortgage payment, as well as well as the treatment of Debtor's escrow account, are being improperly withheld. Debtor also asks for discovery sanctions against CitiMortgage.

In response, CitiMortgage argues that Debtor has not satisfied Local Rule 7026-1 or Federal Rule of Civil Procedure 37(a), which requires a party to engage in good faith discussions before asking a court to resolve a discovery dispute. CitiMortgage also lists a number of general and specific objections to Debtor's discovery requests. For example, under a subheading titled "General Objections," CitiMortgage made thirteen objections, stating, for example, that Debtor's interrogatories are overbroad, confusing, seeking information not in CitiMortgage's possession, duplicative, among others. Additionally, every interrogatory answer contains "Specific Objections," stating, for example, that a question is vague, ambiguous, overly broad, unduly burdensome, seeks information that is confidential or proprietary, is subject to the attorney-client privilege, or "purports to impose on CitiMortgage duties and obligations beyond those set forth in the Federal Rules of Civil Procedure." Even with these objections, CitiMortgage believes it has satisfied Debtor's discovery requests through its answers to Debtor's interroggatories and the production of business records as allowed by Federal Rule of Civil Procedure 33(d).

### a.    Debtor Satisfied Local Rule 7026-1 and FRCP 37(a)

Local Bankruptcy Rule 7026-1 relates to discovery disputes and reads as follows:

> To curtail undue delay in the administration of justice, no discovery procedure filed under Fed. R. Civ. P. 26 through 37 to which objection or opposition is made by the responding party shall be taken under consideration by the Court unless the party seeking discovery shall first advise the Court in writing that, after personal consultation and sincere attempts to resolve differences, the parties are unable to reach an accord. This statement shall recite those matters which remain in dispute, and, in addition, the date, time, and place of such conference, and the names of all parties participating therein. It shall be the responsibility of counsel for the party seeking discovery to initiate such personal consultation.

The local rule is similar to FRCP 37(a), which requires "a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or

22

discovery in an effort to obtain it without court action." CitiMortgage argues that Debtor has failed to satisfy the above requirements.

The policy behind Local Bankruptcy Rule 7026–1, as well as FRCP 37(a)(1), is to "diminish the court's immediate involvement in discovery disputes, specifically those resolvable with minimum effort, bare civility and professional courtesy." In re SII Liquidation Co., 2011 WL 5101786, at *1–2 (Bankr. N.D. Ohio 2011). "To accomplish this end, parties to a discovery dispute are required to undertake resolution among themselves before bringing the issue before the court." Id. The court was unable to locate any binding precedent from the United States Supreme Court or the Sixth Circuit describing the exact requirements necessary to comply with Local Rule 7026-1 or FRCP 37(a)(1). Various bankruptcy courts and district courts have differed in their application of the law. For example, in In re Johnson, the court read the requirement to "confer" from FRCP 37(a)(1) as requiring an actual face-to-face or telephonic meeting or conference, or an attempt to have such a meeting or conference. 408 B.R. 115, 120 (Bankr. S.D. Ohio 2009). Other courts have engaged in a more relaxed reading, allowing email discussions attempting to resolve a discovery dispute to be sufficient. In re Cole, the parties exchanged a number of emails, and eventually issued a subpoena in an effort to conduct a deposition. 2013 WL 5964010, at *1–2 (Bankr. N.D. Ohio 2013). Even though the parties never engaged in a face-to-face or telephonic conversation, the court determined that extensive email conversations and the issuance of a subpoena were sufficient. Id. at *2. While Local Rule 7026–1 requires a "personal consultation" and FRBP 7037(a)(1) requires the parties to "confer" before court involvement, the court does not read these rules as requiring a real-time conversation. Instead, the rules are indicative of a policy choice: to encourage parties to solve discovery disputes without court involvement. In re SII Liquidation, 2011 WL 5101786, at *1–2. While an in person meeting or telephone call may be effective, electronic communications, such as email, may satisfy the requirements.

In the current case, Debtors filed their first set of interrogatories on April 9, 2014. CitiMortgage answered the interrogatories on May 16, 2014. Debtor believes that the responses were inadequate and sent a five-page email response on June 27, 2014. CitiMortgage responded on July 9, 2014, restating their position that many of Debtor's requests are irrelevant, subject to the attorney client privilege, or are overbroad and unduly burdensome. While CitiMortgage did provide some additional documents with its July 9 letter, many potential pieces of evidence were not provided. The court has no evidence of further communications. Even though a telephonic or in-person meeting between the parties did not occur, the parties did exchange lengthy emails. The court believes these discussions are sufficient under Local Rule 7026–1 and FRBP 7037(a)(1).

### b.    The Information Debtor is Attempting to Discover is Relevant

One of CitiMortgage's reasons for not providing certain documents is a belief that certain information is not relevant to Debtor's claims. Specifically, CitiMortgage believes the information relating to the HAMP claim fails as a matter of law due to the lack of a private right of action or a lack of standing. As discussed above, Debtor's breach of contract claim survives summary judgment. Therefore, considering the relevancy standard allows a party to "obtain discovery regarding *any* nonprivileged matter that is relevant to any party's claim or defense,"

CitiMortgage should produce evidence pertaining to Debtor's breach of contract claim withheld based on a lack of relevance. Fed. R. Bankr. Pro. 7026(b)(1) (emphasis added).

### c. CitiMortgage's Claim of Privilege

Rule 26(b)(5)(A) requires any party withholding evidence based on a privilege claim to "expressly make the claim" and "describe the nature of the documents, communications, or things not produced or disclosed—and do so in a manner that . . . will enable other parties to assess the claim." As part of CitiMortgage's general objections to Debtor's interrogatories, CitiMortgage objected to "to the extent that [the questions] seek to discover information covered by the attorney-client privilege or the work product doctrine." In response to specific questions, CitiMortgage also objected if the interrogatory "seeks information that is confidential or proprietary" or "seeks information covered by the attorney-client privilege or the work-product doctrine."

"The burden of establishing the existence of the [attorney–client] privilege rests with the person asserting it." United States v. Dakota, 197 F.3d 821, 825 (6th Cir. 1999). Under Rule 26(b)(5)(A) a party cannot blindly refuse to provide evidence based on a claim of privilege, but instead must provide information sufficient to assess each privilege claim. Perry v. City of Pontiac, 2011 WL 4345279, at *4 (E.D. Mich. 2011). This information is normally given to the court in a privilege log. Id. CitiMortgage shall present the court with a privilege log, after which the court will determine what documents, if any, are protected.

### d. Debtor is not Entitled to Sanctions Against CitiMortgage

Debtor asks the court to impose sanctions against CitiMortgage under Federal Rules of Civil Procedure 16, 26, and 37, which are made applicable in bankruptcy by Federal Rules of Bankruptcy Procedure 7016, 7026, and 7037, respectively. The impositions of sanctions for discovery violations is within the discretion of the trial court. Reg'l Refuse Sys. v. Inland Reclamation Co., 842 F.2d 150, 154 (6th Cir. 1988); Tuttle v. Tyco Elec. Installation Servs., Inc., 2007 WL 4561530, at *3 (S.D. Ohio 2007). Discovery sanctions must balance "fairness and punitive functions." E.E.O.C. v. JP Morgan Chase Bank, N.A., 295 F.R.D. 166, 174 (S.D. Ohio 2013). Courts seek to have cases determined on their merits, and will deem certain matters admitted as a discovery sanction only as a last resort. Id.

The court believes sanctions are inappropriate under Rule 16(f), which allows sanctions if an attorney: "fails to appear at a scheduling or other pretrial conference; is substantially unprepared to participate—or does not participate in good faith—in the conference; or fails to obey a scheduling or other pretrial order." CitiMortgage has not engaged in any action covered by Rule 16(f). CitiMortgage has not violated any scheduling order. Similarly, CitiMortgage has appeared at all pretrial conferences. CitiMortgage's answers to Debtor's interrogatories, as well as providing approximately five-hundred pages of business records, convince the court that CitiMortgage's participation in the discovery process was not in bad faith. Sanctions are inappropriate under Rule 16(f).

Debtor also seeks sanctions under Rule 26(g), which allows sanctions if an attorney submits discovery without proper certification. The advisory notes to Rule 26 state that the rule "imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37." While Debtor did not receive all of the information it hoped from CitiMortgage, and CitiMortgage also asserted a number of objections to Debtor's discovery requests, CitiMortgage's discovery actions fall far short of a level necessitating sanctions. CitiMortgage timely provided responses to Debtor's discovery requests. Sanctions are inappropriate under Rule 26.

Debtor also asks for sanctions under Rule 37(b), which allows sanctions when a party "fails to obey a [court] order to provide or permit discovery." Rule 37(b) is only applicable after a party fails to comply with a court order compelling discovery. Thomas v. Victoria's Secret Stores, 141 F.R.D. 456, 458–59 (S.D. Ohio 1992); Badalamenti v. Dunham's, Inc., 118 F.R.D. 437, 439 (E.D. Mich. 1987). The only discovery order in the current case is the scheduling order. The court has not yet issued an order to compel discovery, foreclosing Rule 37(b) sanctions.

Rule 37(d) allows sanctions if a party fails to respond to interrogatories. The majority view is that Rule 37(d) sanctions may be appropriate if a party's interrogatory answers are "evasive or incomplete." Laukus v. Rio Brands, Inc., 292 F.R.D. 485, 502 (N.D. Ohio 2013). Debtor believes CitiMortgage's failure to provide discovery based on a claim of lack of relevance is tantamount to no answer at all. The court disagrees. While the court has determined that Debtor can bring a state-law breach of contract claim for a violation of HAMP, CitiMortgage's lack of relevance argument was made in good-faith with an adequate legal foundation. Rule 37(d)(2) also notes that a failure to respond to interrogatories "is not excused on the ground that the discovery sought was objectionable, unless the party failing to act has a pending motion for a protective order." However, CitiMortgage has not failed to answer. While CitiMortgage did not provide all the information Debtor desired, that does not make the response sanctionable. Debtor's request for sanctions under Rule 37 is denied.

Lastly, Debtors argues that simply because CitiMortgage raised twenty-four affirmative defenses, near the maximum allowed by law, CitiMortgage is abusing the discovery process. CitiMortgage has complied with the law, and absent individual questions that are an evidentiary violation, using affirmative defenses is not a discovery violation.

**Conclusion**

CitiMortgage, in its memorandum in opposition to Debtor's motion for summary judgment and in its reply in support of its own motion for summary judgment, describes why the methodology used to calculate Debtor's monthly mortgage payment is in compliance with HAMP. Debtor responds by noting that this new argument should not first be raised in responses and replies to summary judgment motions, and that certain documentary evidence is not properly before the court. The court will allow Debtor until **February 28, 2015** to respond to CitiMortgage's explanation of Debtor's monthly mortgage payment. CitiMortgage will then have until **March 27, 2015** to respond. Any documents filed with the court will only pertain to CitiMortgage's calculation of Debtor's monthly mortgage payments.

25

CitiMortgage shall immediately comply with Part VII of this opinion only as it relates to discovery applicable to the calculation of Debtor's monthly mortgage payments. Any documents previously withheld based on a lack of relevance shall be provided to Debtor, and documentation withheld based on a privilege claim shall be listed within a privilege log and filed with the court by no later than **January 31, 2015**.

After the court rules on whether CitiMortgage's calculation of Debtor's mortgage payments complies with HAMP, the above opinion will become final. At that time, the court will enter a final order or submit proposed findings of fact and conclusions of law to the district court as appropriate. An order will be entered simultaneously with this opinion.

It is so ordered.

#     #     #

**Service List**:

**Annie Marie Patrick**
9574 Ashland Road
Wooster, OH 44691

**Thomas Karl Mast**
111 South Buckeye Street
Suite 240
Wooster, OH 44691

**Nathan H. Blaske**
Graydon Head & Ritchey LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, OH 45202